# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
# AT NASHVILLE
Assigned on Briefs May 15, 2012

## STATE OF TENNESSEE v. LATICIA GAIL CAMPBELL

**Direct Appeal from the Circuit Court for Warren County**
**No. F-12425     Larry B. Stanley, Jr., Judge**

---

**No. M2011-01261-CCA-R3-CD - Filed September 24, 2012**

---

A Warren County Jury convicted Defendant, Laticia Gail Campbell, of reckless aggravated assault. She received a sentence of three years, with split confinement, to serve 364 days and the balance on probation, including twenty-four hours of public service work. On appeal, Defendant argues: (1) that the evidence was insufficient to support her conviction; and (2) that the trial court improperly sentenced her. After a thorough review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the  court, in which JOSEPH M. TIPTON, PJ., and NORMA MCGEE OGLE, J., joined.

Dan T. Bryant, District Public Defender; and Trenena G. Wilcher, Assistant Public Defender, McMinnville, Tennessee, (on appeal); and  Robert Peters, Winchester, Tennessee, (at trial), for the appellant, Laticia Gail Campbell.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Lisa S. Zavogiannis, District Attorney General; Thomas J. Miner and Taffy Wilson, Assistant District Attorneys General; for the appellee, the State of Tennessee.

## OPINION

### I. Background

The victim, Joseph Lowery, testified that he and Defendant had been living together approximately six months when they began having problems, and he asked her to move out of the residence. Defendant did not move out of the residence but moved to a separate

bedroom. The victim testified that he kept a knife in a sheath under the mattress on his side of the bed and that he also kept his cell phone in the bedroom. He said that Defendant would try to sneak in the bedroom on her hands and knees in the dark to get his cell phone. She used it to call his friends and "cuss them and want to know where [he] was all the time." The victim testified that he then began hiding his cell phone in his truck.

The victim testified that on New Year's Eve, December 31, 2009, he and his brother planned to go out with some friends. They went to "Jack's," and while there, the victim received phone calls from Defendant. He said, "She called me so much my battery went dead." The victim testified that Defendant was screaming "all kinds of stuff" and cursing. The victim testified that he left Jack's on January 1, 2010, and went to his brother's house where he passed out. He left his brother's house between 8:00 to 9:00 a.m. and went home to lie down because he was feeling sick. The victim testified that Defendant was cursing him when he got home, and he went to bed. He said that Defendant was screaming and hollering when he lay down, and "then she jerked the mattress and [threw] [him] and the mattress [off] of the bed." The victim said that he got up and put the mattress back on the bed and lay down, and Defendant threw him and the mattress off the bed a second time. The victim again placed the mattress back on the bed. He felt the mattress move a third time, and Defendant stabbed him with the knife that he kept under the mattress.

The victim testified that he raised his shirt and "there was blood coming everywhere." He went downstairs to his truck to get his cell phone to call 911, but the battery was dead. The victim testified that he then went to his neighbor, Sheila Myers', apartment to use her phone. He said that Ms. Myers was scared and called 911 for him. The victim was still bleeding, and he felt sick and weak. He was eventually transported to the hospital, and his laceration was sewn up. The victim testified that he was supposed to receive additional x-rays of the wound, and it would hurt and burn very badly when he worked. He said that he was placed on pain medication.

Sheila Myers testified that the victim had blood running down him when he showed up at her door. He raised his shirt and said, "she stabbed me." Ms. Myers called 911, and while she was on the phone, Defendant walked to the top of the stairs. She told Defendant to go back inside her apartment, and Defendant said, "I didn't mean to hurt him. I just want to see if he's okay." Defendant then went back inside the apartment. Ms. Myers told her daughter to get a towel, and Ms. Myers held pressure on Defendant's wound until an ambulance arrived. Ms. Myers testified that Defendant appeared to be "panicked a little bit," and he broke out in a sweat and turned "ashy looking." She also said that the blood soaked through Defendant's shirt, ran down his body, and dripped from the toe of his boots.

Deputy John Bratton of the Warren County Sheriff's Department testified that he was dispatched to the Lakewood Apartments at approximately 9:35 a.m. He arrived and found the victim, who was being assisted by Ms. Myers, sitting on the bottom steps "holding his chest and a great deal of blood on the ground and in front of him." The victim said that his girlfriend had stabbed him. After an ambulance and another officer arrived, Deputy Bratton walked upstairs to the victim's and Defendant's apartment to speak with Defendant. Deputy Bratton testified that when he went in, Defendant walked out of a side room and "blurted out I stabbed him, but I didn't mean it." Defendant then directed Deputy Bratton to a knife in a sheath that was "stuck between the mattresses at the foot of the bed" in a bedroom on the left. Deputy Bratton recovered the knife and took Defendant into custody. He then transported her to jail, and she gave a written statement, which was not introduced into evidence at trial.

Defendant testified that she and the victim began dating in January of 2008, and she moved in with him in October of 2008. She said that the victim's name was on the lease for their apartment, and she paid half of the rent. She also paid for groceries and the utilities. Defendant testified the victim was an alcoholic, and his behavior changed when he drank. She said that she and the victim slept in the same bed until the week before the assault. Defendant admitted that the victim's behavior had changed in that he was staying out all night, was being secretive, and hiding his cell phone. She denied taking his phone or calling his friends. Defendant testified that she and the victim discussed going out together on New Year's Eve, but he was already gone when she arrived home from work that evening. She admitted that she called the victim several times, and he finally called her back at 12:01 a.m. to say "[H]appy New Year."

Defendant testified that she went to bed in the spare bedroom, and the victim came home the next morning at approximately 8:30 to 9:00 a.m. and slammed the door waking her up. Defendant testified that she was upset, and the victim went into the bedroom and attempted to take his pants off over his boots. She said that she and the victim began arguing, and he pulled his pants back up, "went to the kitchen, got a cigarette, went back to smoking, went and laid back on the bed then." Defendant testified she and the victim continued arguing, and he grabbed himself and said, "suck this, bitch." She said:

> I was just frustrated at the situation at hand. [The victim] was laying on the bed, I was standing beside it leaned up against the wall with my hands. When he said suck this, I went to grab his phone. And I only thought the phone was under the mattress because that was [the victim's] routine. When he gets undressed he always put the phone under the headboard of the bed where his knife was. My intentions were to grab that phone and tell him to call whoever

he had been with the night before because that's all he kept saying is [sic] grabbing himself. He was laying this way. When I went - - may I stand up?

\* \* \*

When I went to bend down - - he's like this. When I went (inaudible) he reached over with both his arms and grabbed me by this arm. When I went to grab the knife, thinking it was still in the cover, to pull up to stand back he had me, he was pulling. He went from a lay-down position to standing fully in front of me and then he fell back on the bed I guess realizing that he had been cut. He had me like this, keep in mind. I tried to stand up. He was grazed by the knife. By no means did I deliberately or intentionally rare back with a knife and stab this gentleman. I care for him. I'm not that kind of person.

Defendant denied flipping the mattress with the victim on it. She said that she placed the knife back in the sheath, and she guessed the victim ran out the door. Defendant said that she put some clothes on, stepped outside, and saw the victim sitting at the bottom of the steps with Ms. Myers. She denied telling Ms. Myers that she stabbed the victim or that she was sorry for stabbing him. She claimed that she told Ms. Myers that she was sorry for the "situation at hand for what it was." Defendant testified that she grabbed the knife because she did not know if the victim was "going to force [her] to give him oral sex." She said that the victim had acted with "force and violence" in the past, and she had reason to fear him.

## II. Analysis

### I.     Sufficiency of the Evidence

Defendant challenges the sufficiency of the evidence for her reckless aggravated assault conviction. She argues that the State did not prove that she "consciously disregarded an unjustifiable risk when she brandished the knife [the victim] kept beneath his mattress." When an accused challenges the sufficiency of the convicting evidence, our standard of review is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). The trier of fact, not this Court, resolves questions concerning the credibility of the witnesses, and the weight and value to be given the evidence as well as all factual issues raised by the evidence. *State v. Tuttle*, 914 S.W.2d 926, 932 (Tenn. Crim. App. 1995). Nor may this Court reweigh or re-evaluate the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn.1978). On appeal, the State is entitled to the strongest legitimate view of the evidence and all inferences therefrom. *Id*. Because a verdict of guilt removes the presumption of

innocence and replaces it with a presumption of guilt, the accused has the burden in this Court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). "[D]irect and circumstantial evidence should be treated the same when weighing the sufficiency of [the] evidence." *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).

As relevant to the case *sub judice*, a person commits the offense of reckless aggravated assault when he or she recklessly commits an assault as defined in Tennessee Code Annotated § 39-13-101(a)(1) with the use of a deadly weapon. T.C.A. § 39-13-102(a)(2)(B). A person commits an assault who "intentionally, knowingly or recklessly causes bodily injury to another." *Id*. § 39-13-101(a)(1). "Bodily injury" includes an abrasion or bruise. *Id*. § 39-11-106(a)(2). The term "reckless" refers to a person:

> who acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

*Id*. § 39-11-302(c).

Viewing the evidence in a light most favorable to the State, the proof showed that the victim and Defendant had been in a troubled relationship, and on the morning of January 1, 2010, Defendant was angry because the victim had been out all night. The two argued when the victim got home, and the victim went to bed. The victim testified Defendant continued arguing with him after he went to bed, and she flipped the mattress off the bed two times causing him to fall to the floor. Each time, he placed the mattress back on the bed. The victim testified that he felt the mattress move a third time, and Defendant grabbed a knife that he kept under the mattress and stabbed him in the chest. The victim raised his shirt and saw "blood coming everywhere." He was eventually transported to the hospital, and the laceration was sewn up. Defendant admitted to Sheila Myers and Deputy Bratton that she stabbed the victim but did not intend to hurt him.

Based on our review of the evidence, we conclude that the evidence was sufficient to support beyond a reasonable doubt Defendant's conviction for reckless aggravated assault. Defendant is not entitled to relief on this issue.

*II. Sentencing*

On appeal, the party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is improper. *See* T.C.A. § 40-35-401, Sentencing Comm'n Comments; *see also State v. Arnett*, 49 S.W.3d 250, 257 (Tenn. 2001). When a Defendant challenges the length, range, or manner of service of a sentence, it is the duty of this Court to conduct a de novo review on the record with a presumption that the determinations made by the court from which the appeal is taken are correct. T.C.A. § 40-35-401(d). This presumption of correctness, however, "'is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances.'" *State v. Carter*, 254 S.W.3d 335, 344-45 (Tenn. 2008) (quoting *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991)). "If, however, the trial court applies inappropriate mitigating and/or enhancement factors or otherwise fails to follow the Sentencing Act, the presumption of correctness fails," and our review is *de novo*. *Carter*, 254 S.W.3d at 345 (quoting *State v. Pierce*, 138 S.W.3d 820, 827 (Tenn. 2004); *State v. Shelton*, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992)).

In conducting a de novo review of a sentence, this Court must consider (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the defendant wishes to make in the defendant's own behalf about sentencing. T.C.A. § 40-35-210(b); *see also Carter*, 254 S.W.3d at 343; *State v. Imfeld*, 70 S.W.3d 698, 704 (Tenn. 2002).

*Length of Sentence*

A trial court is mandated by the Sentencing Act to "impose a sentence within the range of punishment." T.C.A. § 40-35-210(c). A trial court, however, "is no longer required to begin with a presumptive sentence subject to increase and decrease on the basis of enhancement and mitigating factors." *Carter*, 254 S.W.3d at 346. Therefore, an appellate court is "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections-102 and-103 of the Sentencing Act." *Id*.

In *Carter*, the Tennessee Supreme Court clarified the 2005 changes in Tennessee sentencing law and stated:

[A] trial court's weighing of various mitigating and enhancement factors has been left to the trial court's sound discretion. Since the Sentencing Act has been revised to render these factors merely advisory, that discretion has been broadened. Thus, even if a trial court recognizes and enunciates several applicable enhancement factors, it does not abuse its discretion if it does not increase the sentence beyond the minimum on the basis of those factors. Similarly, if the trial court recognizes and enunciates several applicable mitigating factors, it does not abuse its discretion if it does not reduce the sentence from the maximum on the basis of those factors. The appellate courts are therefore left with a narrower set of circumstances in which they might find that a trial court has abused its discretion in setting the length of a defendant's sentence.

*Carter*, 254 S.W.3d at 345-46.

Thus, a trial court's "fail[ure] to appropriately adjust" a sentence in light of applicable, but merely advisory, mitigating or enhancement factors, is no longer an appropriate issue for appellate review. *Id*., 254 S.W.3d at 345 (citing *State v. Banks*, No. W2005-02213-CCA-R3-DD, 2007 WL 1966039, at *48 (Tenn. Crim. App. July 6, 2007) (noting that "[t]he 2005 amendment [to the Sentencing Act] deleted appellate review of the weighing of the enhancement and mitigating factors, as it rendered the enhancement and mitigating factors merely advisory, not binding, on the trial courts").

Defendant was convicted of reckless aggravated assault, a Class D felony. As a Range I offender, she was subject to a sentence between two and four years. T.C.A. § 40-35-112 (a)(4). The trial court applied the following enhancement factor: the Defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range. Tenn.Code Ann. § 40-35-114 (1). The trial court also applied one mitigating factor: the defendant acted under strong provocation. Tenn. Code Ann. § 40-35-113 (2).

Defendant argues that "if this court determines that the trial court did give weight to the enhancement factor suggested by the State - the mitigating factor that was specifically given weight by the trial court should have cancelled out the enhancement factor." Concerning mitigating factors, the trial court stated:

Having said that, the defense has submitted mitigating factors that the defendant acted under strong provocation. I would give that a little weight. There was some conflict going on although the use of the knife and stabbing was certainly over the top and not necessary. There was an argument going on

at the time. I don't know that substantial grounds exist tending to excuse or justify her criminal conduct. She was convicted of a lesser offense and acquitted of the offense of aggravated assault, however, I don't think that's a mitigating factor in the sentencing under reckless aggravated assault.

I disagree with number four that it is unlikely that a sustained intent to violate the law motivated the conduct and I don't think she acted under duress or the domination of another person in conducting this activity.

So having considered the pre-sentence report, the entirety of the pre-sentence report, her history socially, her work record, prior criminal activity, and the mitigating factors, the defendant's sentence is set at 3 years.

The trial court in this case obviously gave weight to enhancement factor (1) since it set Defendant's sentence at one year above the minimum sentence of two years. We also point out that any argument about the weight assigned by the trial court to the enhancement and mitigating factors is no longer grounds for appeal. *Carter*, 254 S.W.3d at 344. The record clearly shows that the trial court followed the statutory sentencing procedure, made findings of facts that are adequately supported in the record, and gave due consideration to the principles that are relevant to sentencing. Based on our review, we conclude that the record supports the trial court's discretionary decision to impose a sentence of three years for reckless aggravated assault. Defendant is not entitled to relief on this issue.

*Manner of Service*

Defendant also contends that she should have been sentenced to full probation instead of being ordered to serve 364 days of her three-year sentence in confinement. A defendant is no longer entitled to a presumption that he or she is a favorable candidate for probation. *Carter*, 254 S.W.3d at 347. Our sentencing law, however, provides that a defendant who does not possess a criminal history showing a clear disregard for society's laws and morals, who has not failed past rehabilitation efforts, and who is an especially mitigated or standard offender convicted of a Class C, D or E felony, should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary. T.C.A. § 40-35-102(5), (6). Additionally, a trial court is "not bound" by the advisory sentencing guidelines; rather, it "shall consider" them. *Id*. § 40-35-102(6)(D). We note that "the determination of whether the [defendant] is entitled to an alternative sentence and whether the [defendant] is entitled to full probation are different inquiries." *State v. Boggs*, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996). The defendant has the burden of establishing his or her suitability for full probation, even if the defendant should be considered a favorable candidate for alternative sentencing. T.C.A. § 40-35-303(b); *Boggs*, 932 S.W.2d at 477. In determining whether to

grant probation, the court must consider the nature and circumstances of the offense; the defendant's criminal record; his or her background and social history; his or her present condition, both physical and mental; the deterrent effect on the defendant; and the defendant's potential for rehabilitation or treatment. *State v. Souder*, 105 S.W.3d 602, 607 (Tenn. Crim. App. 2002).

In determining whether incarceration is appropriate, the trial court must consider if:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant....

T.C.A. § 40-35-103(1); *see also Carter*, 254 S.W.3d at 347.

Defendant was an eligible candidate for probation. *See* T.C.A. § 40-35-303(a). In considering Defendant's sentence, the trial court said:

Now having been sentenced to 3 years [Defendant] is entitled to be considered for alternative sentencing and/or probation and as I said, in considering that I've considered the pre-sentence report, the defendant's social history, her physical condition and so forth, the circumstances involving this offense, the conduct that was involved, the prior criminal history as I mentioned before and I think Ms. Wilson brought up whether or not she could reasonably be expected to be rehabilitated. It is disturbing what happened and with prior drug use that certainly puts that into question. The defendant has not abided by the terms of probation on a couple of occasions in the past. I think the interest of society in being protected from possible future criminal conduct are serious and great. Anyone that would take a knife and stab another individual is - - gives you pause as to whether or not you would feel safe with this person in the future.

If the sentence of full probation would unduly depreciate the seriousness of the offense. I think certainly full probation would depreciate the seriousness of the offense. If confinement is suited to provide an effective deterrent likely

[sic] to commit similar offenses. I think that is certainly true. I don't think it sends a good message to say you can stab someone out of anger and simply walk away from it without repercussions of being incarcerated and whether the offense is particularly enormous, gross, or heinous. I don't know that it was particularly gross or heinous other than being a reckless assault, a reckless aggravated assault.

So having said all that I think the defendant should be sentenced to 3 years as a range one offender. She will serve 364 days of that sentence with the balance on probation and she will perform 24 hours of pubic service work.

In addition to the present offense, the presentence report shows that Defendant has prior convictions for traffic offenses, theft under $500, and worthless checks. According to the presentence report, while Defendant was on probation for theft under $500, she failed a drug screen for marijuana in May of 2005, and she failed a drug screen for methamphetamine in June of 2005. In June of 2005 she was then furloughed to the 31st Judicial Drug Court Program. She violated the drug court program by failing a third drug screen for methamphetamine in July of 2005, and she failed to comply with house arrest in August of 2005. After serving sixty days in the Warren County Jail, Defendant re-entered the drug court program and again failed a drug screen for methamphetamine in January of 2006. Defendant, on January 27, 2006,was sentenced to serve six months in the Warren County Jail, and she was to re-enter the drug court program. After serving five months in the Warren County Jail, Defendant was transferred to the Davidson County Drug Court on June 7, 2006, and she finally completed the program on June 24, 2008.

We conclude there is no error in the trial court's judgment as to the manner of service of the sentence. Under a sentence of split confinement a defendant may be required to serve up to one year in the local jail or workhouse. T.C.A. § 40-35-306(a).

## CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed.

_____

THOMAS T. WOODALL, JUDGE

-10-